UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| LEMARICUS DEVALL DAVIDSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | No.: 3:22-CV-15-TAV-DCP |
| KENNETH NELSEN, Warden of | ) | |
| Riverbend Maximum Security Institution, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order of referral by United States District Judge Thomas A. Varlan [Doc. 102].

Before the Court is Petitioner's Motion for Discovery [Doc. 82]. Respondent has filed his Response [Doc. 96], and Petitioner has filed his Reply [Doc. 101]. For the following reasons, Petitioner's Motion for Discovery [**Doc. 82**] in furtherance of his *Strickland* and *Brady* claims "related to Baumgartner," (Requests 1 through 5, relating to Claims 5.9–5.9E) [Doc. 83 p. 27; *see* Doc. 24 pp. 191–96 (Claims 5.9–5.9.E)], is **DENIED WITHOUT PREJUDICE**, and his Motion for Discovery [**Doc. 82**] in furtherance of his *Brady* claim "related to Boyd" (Requests 6 through 8, relating to Claim 6) [Doc. 83 p. 39; *see* Doc. 24 pp. 197–200 (Claim 6)] is **DENIED**.

## I. BACKGROUND

Petitioner is a state prisoner incarcerated at Riverbend Maximum Security Institution, where he is serving two death sentences for the 2007 murders of Channon Christian and Christopher Newsom [Doc. 1 p. 1]. Four co-defendants—Letalvis Cobbins, George Thomas, Vanessa Coleman, and Eric Boyd—were also charged in connection with the murders [Doc. 11-1

pp. 33–56 (Presentment)].[1] *State v. Davidson*, 509 S.W.3d 156, 179 (Tenn. 2016); *see United States v. Boyd*, No. 3:07-CR-3, 2008 WL 4963198, at *1 (E.D. Tenn. Nov. 18, 2008). Petitioner, Cobbins, and Thomas were each tried separately in 2009, and Ms. Coleman stood trial in 2010 [Doc. 11-25 pp. 35, 121, 167–68]. Former Knox County Criminal Court Judge Richard Baumgartner presided over Petitioner's, Mr. Cobbins's, Mr. Thomas's, and Ms. Coleman's trials. *See Davidson*, 2021 WL 3672797 at *3; *see also State v. Cobbins*, No. E2012-02025-CCA-10B-DD, 2012 WL 5266427, at *1 (Tenn. Crim. App. Oct. 25, 2012). In 2011, after the trials, but while Petitioner's motion for a new trial was pending, Judge Baumgartner resigned his judgeship due to allegations of drug abuse. *Davidson*, 2021 WL 3672797 at *3.

Petitioner, following extensive post-judgment proceedings and appeals in state court, challenges "his convictions and death sentences" in this Court, under 28 U.S.C. § 2254 [Doc. 1 p. 1]. Pursuant to the Court's March 9, 2022 Scheduling Order [Doc. 10], Respondent filed the state-court record [Docs. 11–13, 89, 95], Petitioner filed his Petition [Doc. 24], and Respondent has filed his Answer [Doc. 50]. Petitioner, pursuant to *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997), Rule 6 of the Rules Governing 2254 Cases, the Federal Rules of Civil Procedure, and the Court's Scheduling Order, now moves the Court for leave to conduct discovery "in furtherance of his *Strickland* and *Brady* claims related to" Judge Baumgartner and "in furtherance of his *Brady* claim related to *Boyd*," "as well as to assist in showing cause and prejudice sufficient to overcome procedural default" [Doc. 82 pp. 1, 27, 39]. In support of his motion, Petitioner attaches as exhibits

---

[1] Petitioner, Cobbins, Thomas, and Coleman were all charged for the murders of Ms. Christian and Mr. Newsom in 2007 [Doc. 11-1 pp. 33–66 (Presentment)]. In 2007, Boyd was charged with being an accessory after the fact to a carjacking that resulted in serious bodily injury and death and for helping Petitioner avoid arrest, *United States v. Boyd*, 640 F.3d 657, 661 (6th Cir. 2011), but he was not charged for Ms. Christian's and Mr. Newsom's murders until 2018, *see Davidson v. State*, E2019-00541-CCA-R3-PD, 2021 WL 3672797, at *3 (Tenn. Crim. App. Aug. 19, 2021).

the Tennessee Bureau of Investigation's ("TBI") "June 2011 investigative report" ("2011 TBI Report") relating to the TBI's investigation into Judge Baumgartner's misconduct [Doc. 83-1 (citing Docs. 79-1–79-2 SEALED)].[2]

## II. DISCUSSION

The broad discovery provisions of the Federal Rules of Civil Procedure do not apply to habeas proceedings. *Harris v. Nelson*, 394 U.S. 286, 296 (1969) ("[T]he adoption in 1938 of the Federal Rules of Civil Procedure was not intended to make available in habeas proceedings the discovery provisions of those rules."); *see id*. at 293–94 (explaining that "[h]abeas corpus practice in the federal courts has conformed with civil practice" but "only in a general sense"). In this vein, the United States Supreme Court in *Harris*, recognized that "[i]t is the duty of the court to provide" a habeas petitioner "the necessary facilities and procedures for an adequate inquiry" only "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate he is confined illegally and is therefore entitled to relief[.]" *Id*. at 300. Rule 6—adopted by Congress in 1976, after the *Harris* decision—was "meant to be consistent with *Harris*." *Bracy*, 520 U.S. at 909 (citation omitted). The rule provides, in relevant part, that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rule 6(a).

---

[2] Following Judge Baumgartner resignation, Senior Judge Jon Kerry Blackwood was designated as the successor judge over Petitioner's motion-for-new-trial proceedings. On June 24, 2011, while Petitioner's motion for new trial was pending, the Knox County District Attorney General's Office filed the 2011 TBI Report for Judge Blackwood's *en camera* review [Doc. 17-1 p. 3 SEALED]. Judge Blackwood placed "the entire T.B.I. record" under seal pursuant to a protective order, and its disclosure was "restricted to the Attorneys, the defendants and such staff members that are necessary to assist the Attorneys in either the investigation or research necessary for the pending Motions for trial" [*Id*. at 4]. For the reasons explained in this Court's February 16, 2023 Memorandum and Order, the Court temporarily placed the 2011 TBI Report under seal [Doc. 27].

In *Bracy*, the Supreme Court interpreted the meaning of "good cause" under Rule 6. Death-sentenced inmate William Bracy moved for discovery under Rule 6 in support of his judicial-bias claim. 520 U.S. at 904. The judge, who had presided over Bracy's trial, and was a former criminal defense attorney, was convicted of taking bribes from defendants in criminal cases, which resulted in at least two defendants being acquitted or convicted of lesser charges. *Id*. at 901; *id*. at 910 n. 9. Bracy, in support of his motion for discovery, submitted the government's proffer from the trial judge's bribery case, which confirmed that Bracy's murder trial "was sandwiched tightly between trials" the judge fixed. *Id*. at 906–07. In addition, the proffer asserted that at least one attorney from the judge's former law firm actively assisted in corruption, and Bracy's own attorney, whom the trial judge appointed to represent Bracy at trial, was also a former associate of the trial judge "in a law practice that was familiar and comfortable with corruption." *Id*. at 907.[3] The federal district court denied Bracy's motion because it found his "allegations contain[ed] insufficient specificity or good cause to justify further discovery." *Id*. at 902 (citation omitted). The Court of Appeals affirmed, characterizing Bracy's theory "as quite speculative." *Id*. at 905.

The Supreme Court reversed. *Id*. at 903. It acknowledged Bracy's position that his trial lawyer may have been appointed to "camouflage the bribe negotiations" was "only a theory," and it "may well be, as the Court of Appeals predicted," that he will be unable to obtain evidence sufficient to support his judicial bias claim. *Id*. at 908–09. But "proof aside," the Court emphasized

---

[3]     Bracy argued, specifically, that his trial attorney announced he was ready for trial just a few weeks after his appointment, and he requested no additional time before trial to prepare for the penalty phase. *Bracy*, 520 U.S. at 907. Bracy's position was that the trial judge may have appointed Bracy's attorney "with the understanding that he would not object to, or interfere with, a prompt trial, so that [Bracy]'s case could be tried before, and camouflage the bribe negotiations in," another murder case the trial judge fixed—i.e., "the *Chow* murder case." *Id*. at 908–09. The government's proffer showed that Bracy's trial coincided with bribe negotiations in the *Chow* murder case and closely followed another murder case that the trial judge had fixed. *Id*. at 907–08, 910 n. 9.

4

that Bracy supported his discovery requests by, not only pointing to the trial judge's conviction for bribe-taking in other cases, "but also to additional evidence . . . that lend[ed] support to his claim that Maloney [the trial judge] was actually biased *in* [*Bracy*]'*s own case*." *Id*. at 907, 909. That is, he presented "specific allegations" that his trial attorney, a former associate of Maloney's, "may have agreed to take this capital case to trial quickly so that [Bracy]'s conviction would deflect any suspicion the [two] rigged . . . cases might attract." *Id*. at 909. For these reasons, the Court held "it would be an abuse of discretion not to permit any discovery" in Bracy's case. *Id*. at 910.

In line with *Bracy*, the United States Court of Appeals for the Sixth Circuit has recognized that "good cause" exists under Rule 6 when a habeas petitioner shows the requested discovery "*could* yield evidence enabling . . . [him] to prevail on his" claim or "*could* 'resolve any factual disputes that could entitle him to relief.'" *Williams v. Bagley*, 380 F.3d 932, 975 (6th Cir. 2004) (emphasis added) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). Still, a habeas petitioner must, at a minimum, make a fact-specific "showing of good cause under Rule 6," *Stanford*, 266 F.3d at 460 (citations omitted), by "identify[ing] the specific claim(s) that he hope[s] to advance with the requested discovery," *Bagley*, 380 F.3d at 976. A district court will not err in denying a petitioner's motion for discovery when the request falls "more in the category of a fishing expedition" and, even if the facts were found in the petitioner's favor, "would not resolve any factual disputes that could entitle him to relief." *Stanford*, 266 F.3d at 460; *see Keenan v. Bagley*, 262 F. Supp. 2d 826, 838 (N.D. Ohio 2003) ("'[V]ague and conclusory assertions are not sufficient under Rule 6[,] and a petitioner may not embark on a fishing expedition intended to develop claims for which there is no factual basis.'" (citations omitted)).

Petitioner asserts that, "[j]ust as in *Bracy*," his "allegations are specific enough to establish good cause" for discovery and that discovery "could 'yield evidence' enabling" him to prevail on

5

his claims [Doc. 83 p. 39 (quoting *Bagley*, 380 F.3d at 976)]. He seeks to obtain the following

documents to further develop his *Strickland* and *Brady* claims related to Judge Baumgartner:

1. Certain records or documents underlying the 2011 TBI Report into Judge Baumgartner's misconduct [Doc. 82 ¶ 1];

2. TBI agents' rough notes/memos from interviews summarized in the 2011 TBI Report [*Id.* ¶ 2];

3. All medical and mental-health records from additional treating providers that the TBI had knowledge of or referenced in its 2011 TBI Report "but did not obtain" [*Id.* ¶ 3];

4. All records generated by the TBI *after* it disclosed its 2011 TBI Report [*Id.* ¶ 4 (citing Doc. 18-41 pp. 57–63)]; and

5. All of Judge Baumgartner's substance abuse treatment records collected by the United States Probation and Pretrial Services for the Eastern District of Tennessee [*Id.* ¶ 5].

As to his *Brady* claim related to Boyd, he seeks:

6. All records in the Knoxville Police Department's ("KPD") and Investigator Childress's possession tending to suggest Boyd was the triggerman for Mr. Newsom's death, Boyd used a firearm that was not linked to Petitioner, and/or Petitioner was not present when Boyd shot Mr. Newsom [*Id.* ¶ 6];

7. All records in the Knox County District Attorney General's Office tending to suggest Boyd was the triggerman for Mr. Newsom's death, Boyd used a firearm that was not linked to Petitioner, and/or Petitioner was not present when Boyd shot Mr. Newsom [*Id.* ¶ 7]; and

8. All records in the possession of the Federal Bureau of Investigation ("FBI") and/or in the possession of the Alcohol, Tobacco, Firearms and Explosives ("ATF") tending to suggest Boyd was the triggerman for Mr. Newsom's death, Boyd used a firearm that was not linked to Petitioner, and/or Petitioner was not present when Boyd shot Mr. Newsom [*Id.* ¶ 8].

Petitioner does not clearly identify which discovery requests are relevant to which Claim

or Subclaim in his Petition.[4] But, by all appearances, he is seeking discovery in furtherance of the

---

[4] Respondent indicates that Petitioner's discovery "documents" in discovery Requests 1, 2,

following *Strickland* and *Brady* claims related to Judge Baumgartner and *Brady* claim related to

Boyd [Doc. 83 p. 6 (citing Doc. 24 pp.191–200)]:

> Claim 5.9: Trial counsel ineffectively failed to investigate and present evidence demonstrating Judge Baumgartner's mental impairment and bias.
>
> > Subclaim 5.9.A. Counsel did not move to recuse the Knox County District Attorney's office.
> >
> > Subclaim 5.9.B. Counsel stipulated the case for structural error would rest upon a law enforcement investigation report.
> >
> > Subclaim 5.9.C. Counsel ineffectively failed to investigate and present evidence of Judge Baumgartner's mental impairment.
> >
> > Subclaim 5.9.D. Trial Counsel failed to subject the matter of Judge Baumgartner's mental impairment and bias to the adversary process.
> >
> > Subclaim 5.9.E. The post-conviction court denied a full and fair hearing on this claim.
>
> Claim 6: The State failed to disclose exculpatory, impeaching evidence, and evidence showing a denial of Due Process of Law; alternatively, trial counsel failed to investigate and present exculpatory evidence, impeaching evidence, and evidence showing a denial of Due Process of Law.

[Doc. 24 pp. 191–200].

---

and 3 "implicate Claim 2" and discovery Requests 6, 7, and 8 "implicate" Claim 9 [Doc. 96 p. 29, 37]. Petitioner raises a judicial-bias claim in Claim 2 of his Petition [Doc. 24 pp. 4, 85–113], and the following claim in Claim 9: "The late revelation of Thomas's testimony that Boyd shot and killed Mr. Newsom renders Mr. Davidson's conviction and sentences unconstitutional" [Doc. 24 p. 218]. The factual bases of Petitioner's *Strickland* and *Brady* claims in Claim 5.9-5.9.E. and judicial-bias Claim in Claim 2 of his Petition overlap [*Id.* at 85–113, 191–96]. But Petitioner does not include citations to Claim 2 or Claim 9 in his Motion for Discovery that would suggest he is seeking discovery in furtherance of these claims [*see* Doc. 83 pp. at 6, 27, 29 (citing Doc. 24 pp. 191–198, 197–200)]. Accordingly, to the extent Petitioner seeks discovery in furtherance of Claim 2 and Claim 9, the Court, at this time, will not consider Petitioner's discovery requests relating to Claim 2 or Claim 9. *See generally* E.D. Tenn. L.R. 37.2 ("Any discovery motion filed pursuant to . . . the Federal Rules of Civil Procedure shall include, in the motion itself or in an attached memorandum, a verbatim recitation of each . . . request . . . or a copy of the actual discovery document which is the subject of the motion[.]"); *Goldwater Bank, N.A. v. Elizarov*, No. 5:21-cv-00616, 2022 WL 17078950, at \*2 (C.D. Cal. Oct. 7, 2022) ("[T]he court should not have to guess which discovery requests remain at issue[.]").

Respondent argues, in the first instance, that Petitioner is barred from factually developing his *Strickland* and *Brady* claims through discovery under 28 U.S.C. § 2254(e)(2), in light of *Shoop v. Twyford*, 596 U.S. 811 (2022) [Doc. 96 pp. 25, 27]. In the alternative, Respondent argues Petitioner has failed to show good cause for discovery under Rule 6 [*Id*. at 40]. The Court will first consider the parties' positions regarding factual development under Rule 6 and then analyze whether Petitioner has shown he is entitled to discovery.

## A.    Factual Development Under Rule 6

*Twyford* held that "a court must, before facilitating the development of new evidence, determine that it could be legally considered in the prisoner's case." 596 U.S. at 820 (citing *Shinn v. Ramirez*, 596 U.S. 366, 389 (2022); *Bracy*, 520 U.S. at 904). Respondent argues that, in line with *Twyford*, the Court "must first take into account" whether the new evidence Petitioner seeks to develop through discovery is admissible under 28 U.S.C. § 2254(e)(2) [Doc. 96 p. 25 (stating that "a federal court, in deciding whether to grant an evidentiary hearing or 'otherwise consider new evidence' under § 2254(e)(2), must first take into account these restrictions" (citing *Twyford*, 596 U.S. at 818–20 (quoting *Shinn*, 596 U.S. at 389)]. According to Respondent, record development of "the procedurally defaulted components of Claim 5.9 and Claim 6" are "prohibited by § 2254(e)(2) because the petitioner failed to develop the evidence in state court when he could and should have done so" [*Id*. at 35; *see id*. at 30 n. 27].

Although Petitioner does not specify one way or the other whether *Twyford* applies to his Motion for Discovery, he states "factual development" is appropriate because he "diligently sought to develop the facts in state court," consistent with § 2254(e)(2)'s "opening clause" [Doc. 83 p. 9]. But he asserts the state courts "thwarted" his efforts to develop his claims, through no fault of his own [*Id*.]. Petitioner, citing *Williams v. Taylor*, 529 U.S. 420, 435 (2000), states that a "petitioner

8

is 'not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another happenstance'" [*Id*. at 9 (citation omitted)].

### 1.    Section 2254(e)(2)

Section 2254(e)(2) provides that, if a prisoner "has failed to develop the factual basis of a claim in State court proceedings," a federal court may hold "an evidentiary hearing on the claim" in only two limited scenarios. *Id*. The claim must rely on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by the Supreme Court, 28 U.S.C. § 2254(e)(2)(A)(i), or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence[.]" *Id*. § 2254(e)(2)(A)(ii). If a prisoner can satisfy either of these two exceptions, "he also must show that further factfinding would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the crime charged." *Shinn*, 596 U.S. at 381 (quoting 28 U.S.C. § 2255(e)(2)(B)). But "even if all of these requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence" because "[l]ike the decision to grant habeas relief itself, the decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case." *Id*. at 381–82 (citation omitted).

The Supreme Court has interpreted the phrase "failed to develop" under the opening clause of § 2254(e)(2) as meaning that a "petitioner had not exercised enough diligence to avoid the statutory bar" under §§ 2254(e)(2)(A) and (e)(2)(B). *Williams*, 529 U.S. at 430. That is, "'failed to develop' implies some lack of diligence[.]" *Id*.

> By the terms of its opening clause the statute applies only to prisoners who have "failed to develop the factual basis of a claim in State court proceedings." If the prisoner has failed to develop the facts, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2).

9

*Id*. In addition, "[d]iligence for purposes of the opening clause" under § 2254(e)(2) "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court[.]" *Id*. at 435. This "diligence inquiry [under § 2254(e)] *precedes* the analysis under sub-sections (A) and (B) of section 2254(e)(2)." *Richardson v. McCann*, 653 F. Supp. 2d 831, 851 (N.D. Ill. 2008) (emphasis added). So, if a petitioner establishes "he was diligent in his attempts to develop the factual record in the state court, he does not have to satisfy the remaining provisions of § 2254(e)(2) in order to obtain an evidentiary hearing." *Owens v. Frank*, 394 F.3d 490, 499 (7th Cir. 2005) (citing *Williams*, 529 U.S. at 435).

### 2. *Twyford*

In *Twyford*, death-row inmate Raymond Twyford had moved the district court for an order "compelling the State to transport [him] to . . . [a medical center] for medical testing necessary for the investigation, presentation, and development of claims" he raised in his federal habeas petition. 596 U.S. at 816 (internal quotation marks and citation omitted). Twyford argued it was "plausible that the testing was likely to reveal evidence in support of' [his] claims" and that it "could counter arguments of procedural default or exhaustion." *Id*. (internal quotation marks and citation omitted). The district court granted Twyford's motion under the All Writs Act, which permits federal courts to "'issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.'" *Id*. (quoting 28 U.S.C. § 1651(a)). The Sixth Circuit affirmed, concluding, as the district court had, that it was unnecessary to consider the admissibility of any resulting evidence before ordering the State to transport Twyford to gather it. *Id.* at 816; *see id*. at 811.

The Supreme Court reversed. In its reasoning, it reiterated that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")—which applies to Petitioner's case herein, *see Woodford v. Garceau*, 538 U.S. 202, 204, 207 (2003) ("[A]n application filed after AEDPA's effective date should be reviewed under AEDPA[.]")—"restricts" the ability of a federal habeas court to develop and consider new evidence. *Twyford*, 596 U.S. at 819. And, while acknowledging that "state prisoners may occasionally submit new evidence in federal court" under § 2254(e)(2), those circumstances, the Court stated, are limited. *Id*. at 819–20. Given the AEDPA's restrictions, the Court—citing *Bracy*—stated that "a court must, before facilitating the development of new evidence, determine that it could be legally considered in the prisoner's case." *Id*. at 820 (citing *Bracy*, 520 U.S. at 904). For these reasons, the Court found that the Court of Appeals erred in ordering Twyford's transfer before determining whether "the desired evidence would be admissible in connection with a particular claim for relief." *Id*. at 824.

### 3. *Strickland* and *Brady* Discovery Requests Related to Judge Baumgartner

While the Sixth Circuit has not yet decided whether *Twyford* applies to motions to discovery under Rule 6, Respondent cites *Mammone v. Jenkins*, 49 F.4th 1026, 1058–59 (6th Cir. 2022), in which the Sixth Circuit discussed *Twyford*'s holding, as well as § 2254(e)(2)'s limitations, in finding that the district court did not abuse its discretion in denying the petitioner's motion for discovery. *Id*. ("Mammone does not purport to satisfy any of the stringent requirements for obtaining discovery or an evidentiary hearing[.]"); *see id*. ("As the Supreme Court recently recognized, AEDPA 'restricts the ability of a federal habeas court to develop and consider new evidence.'" (quoting *Twyford*, 596 U.S. at 819)).

Federal district courts, however, have applied *Twyford* when considering habeas petitioners' motions for discovery under Rule 6. *See, e.g.*, *Rubio v. Lumpkin*, 729 F. Supp. 3d 616,

694 (S.D. Tex. 2024); *Underwood v. Cain*, No. 3:06-cv-273, 2024 WL 4311505, at *4–6 (S.D. Miss. Sept. 26, 2024); *Twyford v. Chillicothe Corr. Inst.*, No. 2:03-CV-906, 2024 WL 1307117, at *2–3 (S.D. Ohio Mar. 27, 2024); *Obermiller v. Shoop*, No. 1:19 CV 2193, 2024 WL 404490, at *2 (N.D. Ohio Feb. 2, 2024); *Shockley v. Crews*, 696 F. Supp. 3d 589, 621 (E.D. Mo. 2023); *Hubbell v. Reagle*, No. 1:20-cv-02217, 2023 WL 3886372, at *5 (S.D. Ind. June 8, 2023) (stating that *Twyford* "raises the bar for conducting discovery" and its "broad language indicates that its holding likely applies to Mr. Hubbell's motions to conduct discovery" (citation omitted)); *Sapp v. Jenkins*, No. 2:17-cv-1069, 2023 WL 3475412, at *3 (N.D. Ohio May 16, 2023). In doing so, some federal district courts have denied motions for discovery as premature when they could "not presently" determine whether a claim was procedurally defaulted or was adjudicated on the merits in state court, *Burns v. Thornell*, No. CV-21-01173, 2025 WL 3562574, at *3 (D. Ariz. Dec. 12, 2025) (citing *Twyford*, 596 U.S. at 818, 821), and to avoid "piecemeal rulings on the substance of" claims, *Short v. Chillicothe Corr. Inst.*, No. 3:19-cv-052, 2025 WL 601257, at *5 (S.D. Ohio Feb. 25, 2025) (denying without prejudice the petitioner's discovery request "at this juncture because the Court [wa]s not yet ruling on the merits (or procedural deficiencies) of [petitioner]'s claims"). *See Arcibal v. Bean*, No. 2:23-cv-00097, 2026 WL 509525, at *4 (D. Nev. Feb. 24, 2026) (denying discovery request without prejudice "as premature") (citing *Twyford*, 596 U.S. at 818, 821); *Arcibal*, 2026 WL 509525 at *4 ("[I]t will be more appropriate, and efficient, for any such request for leave to conduct discovery to be presented in conjunction with the full briefing of the merits of the claim and whether Arcibal can demonstrate cause and prejudice.").

In line with this authority, and upon reviewing Petitioner's Motion and his Claims in 5.9, the Court finds it appropriate to deny Petitioner's discovery requests at this stage as they relate to Petitioner's *Strickland* and *Brady* claims "related to Baumgartner," for several reasons [Doc. 83 p.

12

27]. First, Petitioner does not specify which of his ineffective-assistance-of-trial-counsel claims in 5.9 of his Petition, or in his Motion, he has adjudicated on the merits in state court and procedurally defaulted, notwithstanding that he is moving for discovery, in part, "to assist in showing cause and prejudice sufficient to overcome procedural default" [*Id*. at 1, 27]. Moreover, the factual allegations Petitioner pleads in his Petition in Claim 5.9 and its Subclaims are fact-intensive and may overlap with facts Petitioner did fairly present to the state courts with facts he did not fairly present to the state courts [*See* Doc. 24 pp. 191–96]. *See Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009) ("To be properly exhausted, each claim must have been 'fairly presented' to the state courts." (citations omitted)). In addition, Petitioner discusses *Twyford* only briefly in his Reply, without any meaningful discussion of its application to his claims [Doc. 83 p. 10; Doc. 101 p. 5]. As such, to the extent *Twyford* applies to Petitioner's discovery requests, the Court is unable to ascertain at this stage whether "development of new evidence," facilitated through discovery, in furtherance of his *Strickland* and *Brady* claims related to Judge Baumgartner, "could be legally considered" [Doc. 82 pp. 1–7]. *See Twyford*, 596 U.S. at 820 (citing *Shinn*, 596 U.S. at 389; *Bracy*, 520 U.S. at 904); *id*. (stating that "*before* facilitating the development of new evidence, [a court must] determine that it [the new evidence] could be legally considered" (emphasis added)).

For these reasons, the Court will **DENY WITHOUT PREJUDICE** Petitioner's Motion for Discovery as it relates to his *Strickland* and *Brady* claims related to Judge Baumgartner (Requests 1 through 5).[5]

---

[5] Petitioner's *Brady* claim related to Judge Baumgartner is pleaded as part of Claim 5.9, and it is intertwined with Petitioner's ineffective-assistance-of-trial-counsel claims [Doc. 24 p. 191 ("Counsel failed to seek *Brady* material or conduct an independent investigation into Judge Baumgartner's bias and impairment.")].

### B. *Brady* Discovery Requests Related to Boyd

Petitioner seeks *Brady* material that "may establish cause and prejudice to excuse any procedural default" [Doc. 83 p. 13 (citing *Banks v. Dretke*, 540 U.S. 668, 692 (2004))]. In his motion, he identifies his *Brady* claim as follows: "[T]he State may have possessed information about Boyd's responsibility for Newsom's death but failed to disclose it" [Doc. 83 p. 40 (citing Doc. 24 pp. 197–99)]. In his Motion, Petitioner provides citations to Claim 6 in his Petition, [Doc. 83 p. 40 (citing Doc. 24 pp. 197–200)], and the following discovery requests are relevant to this *Brady* claim [Doc. 83 p. 40–41]:

> 6.     All records in the Knoxville Police Department's ("KPD") and Investigator Childress's possession tending to suggest Mr. Boyd was the triggerman for Mr. Newsom's death, he used a firearm that was not linked to Petitioner, and/or Petitioner was not present when Boyd shot Newsom [Doc. 82 ¶ 6];
>
> 7.     All records in the Knox County District Attorney General's Office tending to suggest Boyd was the triggerman for Mr. Newsom's death, he used a firearm that was not linked to Petitioner, and/or Petitioner was not present when Boyd shot Mr. Newsom [*Id.* ¶ 7]; and
>
> 8.     All records in the possession of the Federal Bureau of Investigation ("FBI") and/or in the possession of the Alcohol, Tobacco, Firearms and Explosives ("ATF") tending to suggest Boyd was the triggerman for Mr. Newsom's death, he used a firearm that was not linked to Petitioner, and/or Petitioner was not present when Boyd shot Mr. Newsom [*Id.* ¶ 8].

Petitioner argues he was diligent in attempting to develop the factual basis of this *Brady* claim for the reasons the Court will incorporate below [Doc. 83 pp. 19–26]. In the alternative, he asserts good cause exists for discovery as to "Requests 6 and 7" and Request 8 [*Id.* at 40–41]. To understand the substance of this claim, the Court will first summarize relevant portions of the state-court proceedings before addressing whether Petitioner was diligent in developing the factual basis of his *Brady* claim in state court and, in the alternative, whether he has shown good cause for

14

discovery under Rule 6. *See Obermiller*, 2024 WL 404490 at *2 (analyzing the petitioner's discovery requests under *Twyford*'s standard and Rule 6's and *Bracy*'s good-cause standard).

### 1. State Proceedings

### a. Trial and Evidence Related to Mr. Newsom's Murder

The evidence from Petitioner's trial showed that Petitioner was arrested on January 11, 2007, in a vacant house at 1800 Reynolds Avenue [Doc. 12-16 p. 86:22–26; *id*. at 87:1–2]. Among the items found in the house were Mr. Newsom's size 9 ½ Nike athletic shoes and a Sentinel .22 caliber revolver ("Sentinel") [Doc. 12-18 pp. 135, 137, 142; *see* Doc. 12-17 p. 42:22–23]. *Davidson*, 509 S.W. 3d at 178. Knox County Medical Examiner Dr. Darinka Mileusnic-Polchan testified that Mr. Newsom had been shot three times, each time with a small caliber bullet. *Davidson*, 509 S.W.3d at 173, 178. During Petitioner's interview with Tennessee Bureau of Alcohol, Tobacco, Firearms, and Explosives Agent Forrest Webb, Petitioner denied ever seeing Mr. Newsom or Ms. Christian, but Agent Webb testified that Petitioner's story changed several times [Doc. 12-21 pp. 49–50]. In addition, Petitioner told Agent Webb that Cobbins told him Thomas killed Mr. Newsom. *Davidson*, 509 S.W. 3d at 177–78. A different gun—a .22 caliber Clerke revolver ("Clerke")—was recovered from Natosha Hays's house in Lebanon, Kentucky, where Cobbins, Thomas, and Coleman were arrested [Doc. 12-20 pp. 36, 40–42]. *Davidson*, 509 S.W.3d at 178.

Through ballistics expert Patricia Resig, the State sought to prove Petitioner killed Mr. Newsom with the Sentinel revolver. [Doc. 12-20 p. 107]. Ms. Resig compared test fires from the Sentinel and the Clerke with the bullets recovered from Mr. Newsom's body [*Id*. at 107–108]. She testified that the bullet removed from Mr. Newsom's neck and bullet removed from his back were fired from the same gun [*Id*. at 114]. In comparing the Sentinel and the Clerke, Ms. Resig stated

15

that these two bullets could have been fired from the Sentinel because the test fires from that gun "displayed similar class characteristics to these two bullets" [*Id*. at 115:1-4]. But the test fire from the Clerke, she stated, "displayed a signature disagreement of the characteristics to the bullets" [*Id*. at 115:23-5; 116:1]. The third bullet from Mr. Newsom's skull was damaged, "mak[ing] an examination difficult," but she could not say, conclusively, that the bullet "was not fired" from the Sentinel [*Id*. at 119:2–11].

### b.     *Coram Nobis* Proceeding

On June 7, 2019, while Petitioner's appeal on the trial court's denial of his petition for post-conviction relief was pending, Petitioner filed a petition seeking a writ of *error coram nobis* in the Knox County Criminal Court based on Boyd's upcoming trial for the murders of Ms. Christian and Mr. Newsom [Doc. 13-17 pp. 5–33]. Petitioner indicated in his petition that, on September 28, 2018, Prosecutor Leland Price informed Petitioner's post-conviction counsel that Thomas would testify to the following at Boyd's upcoming trial: (1) Thomas saw Boyd kill Mr. Newsom and (2) Petitioner was not present at the time of Mr. Newsom's killing [*Id*. at 6]. The Tennessee Court of Criminal Appeals summarized the arguments Petitioner raised in his petition as follows:

> [Petitioner] argued that he was entitled to a new trial and/or sentencing hearing because of new evidence, mainly that Thomas had agreed to testify for the State in Boyd's then-upcoming trial that Boyd, not the Petitioner, shot and killed Mr. Newsom and burned his body. Thomas would further testify that the Petitioner was not present at the scene when Mr. Newsom was killed. The Petitioner became aware of the Thomas evidence in September 2018.

*Davidson*, 2021 WL 3672797 at *4.

Petitioner requested a hearing so the Court could gauge Thomas's credibility and so Petitioner could develop the record to determine if this newly discovery evidence warranted a new trial and rendered his death sentence infirm [Doc. 13-17 p. 7]. Petitioner filed an amended petition,

16

and following Boyd's trial, he filed a supplement to his amended petition, which included a transcript of Thomas's testimony at Boyd's trial [Doc. 13-18 pp. 2–181]. The trial court held a hearing on Petitioner's petition for *coram nobis* relief on October 21, 2019, [*id*. at 184, 191], and Thomas and one of Petitioner's trial attorneys testified [Doc. 13-29].[6] The relevant portion of Thomas's testimony was summarized by the Tennessee Court of Criminal Appeals as follows:

> According to Thomas, in the morning hours of January 6, 2007, Cobbins talked about the Petitioner's plan to steal or "get" a car. Thomas, Cobbins, Coleman, and the Petitioner were present during that conversation. At some point, Cobbins and the Petitioner left the Petitioner's house while Coleman and Thomas remained. Later that evening, Cobbins, Boyd, and the Petitioner returned to the house with Ms. Christian and Mr. Newsom. Both victims had their hands tied, and Mr. Newsom's "head or eyes" were covered. Cobbins entered the house first and told Thomas to "get up. Come on. Let's go. Get your stuff." Thomas followed Cobbins through the kitchen and into the back bedroom. The Petitioner, who had followed Cobbins into the house, led Ms. Christian into the front bedroom. Thomas testified that he did not see or hear Ms. Christian again the rest of that weekend. Boyd stayed in the living room with Mr. Newsom nearby. Thomas realized the victims had been kidnapped.
>
> Thomas eventually returned to the living room to find Boyd and the Petitioner there. The Petitioner told Thomas to "go with him," referring to Boyd. Thomas asked the Petitioner, "What's up? What's going on?" The Petitioner just replied, "Go with him." At that point, Thomas did not know why the Petitioner had told him to go with Boyd and did not know Boyd was going to take Mr. Newsom with them. Thomas did not see the Petitioner give Boyd a gas can. Boyd and Thomas put Mr. Newsom into Ms. Christian's vehicle, drove around "basically" in a circle, and ended up behind a warehouse. Mr. Newsom jumped out of the vehicle. Boyd directed Thomas to "help him or whatnot," but Thomas "just kind of shook [his] head, like, no." Boyd then grabbed Mr. Newsom and walked him across a drainage ditch. Boyd led Mr. Newsom behind a stand of trees, and Thomas saw three flashes. Boyd then dragged Mr. Newsom's body "on the other side of the warehouse" and returned to the vehicle to

---

[6] The trial court held a hearing on Petitioner's petition for *coram nobis* relief on October 21, 2019, after it held a hearing on his petition for post-conviction relief on January 28, 2019, and January 29, 2019. *See Davidson*, 2021 WL 3672797 at *13. The trial court issued its decision on Petitioner's petition for post-conviction relief on February 27, 2019 [Doc. 13-16 pp. 60–61].

retrieve a gas can. A "couple minutes later," Thomas saw a fire. Boyd returned to the vehicle, and they drove back to the Petitioner's house. According to Thomas, Boyd did not talk "about what was going on" during their excursion.

Thomas testified that when he and Boyd entered the Petitioner's house, Boyd told the Petitioner "something, like, okay. That's – it's don- -- that's done or something to that effect." Thomas initially testified that the Petitioner said "nothing" in response to Boyd's comment. However, Thomas then testified, "I mean, probably just okay...." Thomas explained, "I mean, Mr. Boyd said, like, that's done. And then [the Petitioner] – I mean, I can't say exactly what he said, 'cause, I mean, I didn't just hear it, but it sounded like, okay or something like that." Thomas said he "couldn't be sure what exactly [the Petitioner] said." Cobbins also was at the house when Boyd and Thomas returned. Cobbins asked Thomas what happened, and Thomas replied that "he just killed the dude." According to Thomas, Cobbins reacted as if he did not know that was going to happen. Thomas did not hear anyone discuss Mr. Newsom again. Thomas also testified that he never heard the Petitioner directly tell anyone "to murder Christopher Newsom" or "to set Christopher Newsom's body on fire." He also did not hear anyone tell the Petitioner that they were going to kill Mr. Newsom. Thomas said he would not have gone with Boyd if he had known Boyd was going to kill Mr. Newsom. Thomas further said he did not know Boyd was going to kill Mr. Newsom until "[p]robably around the time we pulled up behind the warehouse."

Thomas testified that after his arrest in 2007, he did not tell the police about all of those details because he "didn't want to get drug into it even more than it [sic] was." Thomas also did not inform the police that he saw Boyd kill Mr. Newsom and that the Petitioner was not present. He did not reveal that information to the State until sometime in 2018. Thomas said that he had not seen the Petitioner since "probably 2008" and that the Petitioner did not ask him to come forward with the new information.

*Davidson*, 2021 WL 3672797 at *53–54. By order dated November 7, 2019, the trial court denied

Petitioner's petition [Doc. 13-18 pp. 191–217]. The Tennessee Court of Criminal Appeals

affirmed. *Davidson*, 2021 WL 3672797 at *64.

18

### 2. Diligence Analysis

Petitioner claims he was diligent in attempting to develop the factual basis of this *Brady* claim but was unable to do so because the state court "thwarted" his efforts. [Doc. 83 pp. 19–26; *see id*. at 9 (stating that "'[d]iligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt . . . to investigate and pursue claims in state court'" (quoting *Williams*, 29 U.S. at 435))].

The Supreme Court in *Williams*, which Petitioner cites in both his Motion and Reply [Docs. 83, 101], interpreted the "failure [to develop]" under § 2254(e) opening clause when the inmate (Williams) failed to develop his *Brady* claim in state court and sought an evidentiary hearing on his claim in federal district court:

> To say a person has failed in a duty implies he did not take the necessary steps to fulfill it. He is, as a consequence, at fault and bears responsibility for the failure. In this sense, a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance.

529 U.S. at 432. As previously stated, "[d]iligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court[.]" *Id*. at 437. When, as here, "the failure to develop the factual basis of a constitutional claim is attributable to procedural default, the determination of whether the petitioner has been diligent in developing his claim parallels the issue of whether he can show cause for his default." *Id*. at 444. "The 'cause' factor requires the petitioner to show 'some objective factor external to the defense [that] impeded [the defense's] efforts to comply with the State's procedural rule.'" *Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010) (quoting *Murray v. Carrier,* 477 U.S. 478, 488 (1986)). "Examples include 'a showing that the

factual or legal basis for a claim was not reasonably available' previously, or 'some interference by officials.'" *Id.* (citation omitted).

Again, Petitioner points to the state court's attempts to thwart his efforts to develop his *Brady* claim as cause for his failure to develop this claim. Specifically, he asserts that the trial court denied him adequate time to investigate and develop *Brady* evidence [Doc. 83 p. 19]. In support of his position, he states that his post-conviction counsel learned on September 28, 2018, that Thomas would testify at Boyd's trial that Boyd was the "triggerman for Newsom's death" [*Id.* at 21]. He asserts, however, that the State's discovery disclosure was late and included over 70 gigabytes of material [Doc. 83 p. 21]. Yet, the trial court, he explains, gave him just ten days to file an amendment to his petition for post-conviction relief based on that discovery and set an evidentiary hearing on his amended petition for post-conviction relief on January 28, 2019 [*Id.*; *see* Doc. 22-27 p. 142 (Trial Court's Order)]. In addition, he asserts that he moved the trial court for continuances of the January hearing on his petition for post-conviction relief, but the trial court denied his requests, notwithstanding that one of his motions for continuance noted the possible exculpatory nature of the newly-discovered evidence [Doc. 83 p. 22; *see* Doc. 22-27 p. 142; *see also* Doc. 22-28 pp. 59–73 (Motion for Continuance)]. Second, Petitioner states he was diligent in developing his *Brady* claim because his post-conviction counsel moved the state court to gain access to Thomas's sealed post-conviction proceedings to learn more about the revelation that Thomas would testify against Boyd, [Doc. 83 pp. 23–24 (citing Doc. 22-28 pp. 106–119 ("Motion to Withdraw All Sealed Filings in the George Thomas Post-Conviction Proceedings"))],[7] but the

---

[7] The trial court denied "as unnecessary" Petitioner's post-conviction "Motion to Withdraw All Sealed Filings" in Thomas's post-conviction proceedings because Petitioner "already kn[e]w[] the information sought and available in the Thomas file" [Doc. 22-28 p. 130].

state court denied his motion, [Doc. 22-18 p. 30].[8]

Respondent argues Petitioner "could and should have raised this defaulted *Brady* claim" and developed the proof on it, in his post-conviction proceedings, when he raised other issues related to Thomas's expected testimony at Boyd's trial [Doc. 96 p. 39]. For this reason, Respondent argues Petitioner's late presentation of this claim in this federal habeas proceeding is barred under § 2254(e) [*Id.*; *see id.* at 28 ("'A court . . . must, consistent with AEDPA, determine at the outset whether the evidence sought could be lawfully considered.'" (quoting *Twyford*, 596 U.S. at 820))]. Respondent asserts that Petitioner cannot otherwise show cause for procedurally defaulting this claim, noting that Petitioner "does not identify the specific evidence that the State purportedly suppressed in this regard; therefore, he cannot explain his failure to raise a *Brady* claim on post-conviction review" [*Id.* at 39]. But even if he could show cause for the default, Respondent argues there is no prejudice because he cannot show materiality on any supposedly suppressed evidence:

> If anything, Thomas's new testimony, as weighed and accredited by the trial court, bolsters the petitioner's guilty verdict by confirming that the petitioner directed Boyd to kill the victim. And his death sentence is fully supported by the three aggravating circumstances upheld in the post-conviction and error-coram-nobis appeal.

[*Id.*].

---

[8] Petitioner also states he "diligently attempted to uncover ATF and FBI files because his federal habeas counsel, within months of appointment, sought the ATF and FBI files [Doc. 83 p. 25]. But he neither offers any information as to when these records came into existence nor does he offer information as to Petitioner's efforts to obtain these records in state-court proceedings that could show he was diligent in developing his *Brady* claim. And although he claims his federal habeas counsel were diligent in obtaining these records in this proceeding, he has not cited any authority indicating that federal habeas counsel's diligence, as opposed to his state attorney's, is relevant to whether the Court may consider this new evidence. *See Williams*, 529 U.S. at 435 ("Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in *state* court[.]" (emphasis added)).

In Reply, Petitioner relies on *Strickler v. Greene*, 527 U.S. 263, 283 (1999) and *Banks*, 540 U.S. at 692 for the general proposition that the Supreme Court "found it reasonable for the petitioner to have relied upon the prosecution's open file policy" and that the Court found again in *Banks* that "trial counsel may rely upon prosecution assertions that all evidence favorable to the defense had been disclosed" [Doc. 101 p. 8]. He points to the state court's order directing the State "to turn over *Brady* material" [*id.* at 9; *see* Doc. 22-25 p. 62 (Trial Court's May 8, 2018 Scheduling Order)]. Accordingly, Petitioner's post-conviction counsel, he argues, "was entitled to assume all *Brady* material had been produced" [*Id.*].

*Williams*, which Petitioner cites in both his Motion and Reply [Docs. 83, 101], is illustrative of when a prisoner has and has not exercised diligence in failing to develop the factual basis of a claim in state court. 529 U.S. at 429. Like Petitioner, inmate Williams raised a *Brady* claim in his federal habeas proceeding that he failed to develop in state court. In support of his *Brady* claim, he alleged the prosecution failed to disclose his accomplice's pre-trial psychiatric examination. *Id.* at 427. According to Williams, he therefore could not have developed his *Brady* claim earlier because he was unaware, through no fault of his own, "of the underlying facts," due to the state's withholding of the examination. *Id.* at 429.

The Court found Williams did not show he was diligent for failing to develop his claim in state court because the report reflected that Williams's accomplice had little recollection of the murders, and the report was available to counsel since it was prepared pre-trial. *Id.* at 437. In addition, it found Williams was not diligent in failing to develop his *Brady* claim even though his state habeas counsel failed to discover the report because counsel was "on notice of the report's existence and possible materiality." *Id.* at 439. Although state habeas counsel sent a letter to the prosecutor requesting all medical and psychological tests performed "upon any prosecution

22

witness," the Court noted that "it appear[ed] counsel made no further efforts to find the specific report[.]" *Id*. at 439–40 (internal quotation marks and citation omitted). As such, trial counsel's lack of diligence "trigger[ed] the opening clause of § 2254(e)(2)." *Id*. at 440. In other words, for the federal court to hold an evidentiary hearing, Williams would have had to have shown he could satisfy §§ 2254(e)(2)(A) and (B). *Id*. Conversely, the Court did find Williams was diligent in his efforts to develop the facts supporting his juror-bias and prosecutorial-misconduct claims in state collateral proceedings when the "the factual basis of the claims was not reasonably available to petitioner's counsel" and "underdevelopment" of the claim was attributable to the prosecutor. *Id*. at 443.

But, unlike Williams, the record supports that Petitioner's post-conviction counsel was "on notice"—or at the very least, recognized—the existence of a possible *Brady* claim related to Boyd's involvement in Mr. Newsom's murder. *Id*. at 439; *see United States v. Blanchard*, 8 F. Supp. 2d 668, 669 (E.D. Mich. 1998) ("'The mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for default.'" (emphasis added) (quoting *Murray*, 477 U.S. at 488)); *see also Brooks*, 626 F.3d at 878 ("Examples [of some objective factor external to the defense] include 'a showing that the factual or legal basis for a claim was not *reasonably* available' previously, or 'some interference by officials.'" (emphasis added) (citation omitted)). The state-court record reflects post-conviction counsel had Investigator Childress's interview notes of Thomas in September of 2018 [Doc. 22-28 pp. 62–63], which post-conviction counsel referenced in their October 17, 2018 Motion for Continuance [*Id*. at 63]. At that time, post-conviction counsel noted their potential "exculpatory" value under "*Brady v. Maryland*, (1963) 373 U.S. 83" [*id*. at 63], and the State supplied post-conviction counsel over 70 gigabytes of material related to Boyd [Doc. 83

23

p. 21 (citing Doc. 22-28 pp. 59–104)]. The trial court permitted Petitioner to file an amended petition for post-conviction relief to supplement his petition given the newly-discovered evidence related to Boyd, and Petitioner, through his post-conviction counsel, did so by filing a "Supplemental Amended Petition for Post-Conviction Relief" [Doc. 22-27 pp. 154–185] and then a "Second Supplement to Amended Petition for Post-Conviction Relief" on December 14, 2018 [Doc. 22-28 pp. 154–57].

However, the Supplemental Amended Petitions for Post-Conviction Relief do not reflect that post-conviction counsel made any effort to mention *Brady*, [Doc. 22-27 pp. 168–77; Doc. 22-28 pp. 154–57], and Petitioner does not offer any reason as to why post-conviction counsel could not have simply pleaded a *Brady* claim in Petitioner's Supplemental "Amended Petition[s] for Post-Conviction Relief" to preserve it on appeal. [9] *See Brown v. State*, 928 S.W.2d 453, 457 (Tenn. 1996) ("As a general rule, this court will not address post-conviction issues that were not raised in the petition or addressed in the trial court." (citation omitted)); *see also Blanchard*, 8 F. Supp. 2d at 669 ("'The mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to *raise* the claim despite recognizing it, does not constitute cause for default.'" (emphasis added) (quoting *Murray*, 477 U.S. at 488)).

To the extent that Petitioner relies on *Strickler* and *Banks* in support of his argument that the State also thwarted his efforts to factually develop his *Brady* claim, the Court finds *Strickler*

---

[9]     Petitioner's claims were limited to the following: Claim 40: Mr. Davidson is Innocent of the Death Penalty Arising from the Murder of Christopher Newsom as the Jury Based its Sentencing on Invalid Aggravators; Claim 41: The Newly Discovered Evidence that Mr. Davidson did not Kill Christopher Newsom or Set His Body on Fire Requires Resentencing by a Jury; Claim 42: The State's Disparate Treatment of Mr. Davidson's Equally Culpable Co-Defendant Renders his Death Sentence Unconstitutional; and Claim 43: Arguing at Trial that Boyd was the shooter in Newsom's Murder is a Core Inconsistency in the State's Theory and Inconsistent Prosecutorial Theories Violate Due Process. [Doc. 22-27 pp. 169–77].

24

and *Banks* distinguishable from Petitioner's case. In both cases, the Court found the petitioners had shown cause for excusing procedural default of their *Brady* claims notwithstanding their failure to develop the factual basis of their claims in state court. *Strickler*, 527 U.S. at 276; *Banks*, 540 U.S. at 695.

In *Strickler*, the state argued the petitioner was not diligent when he failed to develop the factual basis of his *Brady* claim in state court because the petitioner's state counsel failed to file a pretrial motion for discovery to uncover exculpatory evidence. 527 U.S. at 276. The *Strickler* Court disagreed with the state's position that the petitioner's state counsel was at fault—or not diligent—for failing do so because "there [wa]s no dispute" that the state had failed to disclose exculpatory evidence. 527 U.S. at 282. In addition, it found that the petitioner's counsel reasonably relied on the prosecutor's "open file policy, which gave petitioner's counsel access to all of the evidence in the . . . prosecutor's files." *Id*. at 277.

In *Banks*, the state argued that the petitioner was not diligent when he failed to develop his *Brady* claim because his state counsel failed to interview investigators to uncover exculpatory evidence. 540 U.S. at 695. *Id*. The *Banks* Court disagreed with the state's position, however, because the state "continued to hold" through direct appeal and state collateral proceedings, exculpatory evidence. Like *Strickler*, it found that the petitioner's state counsel, therefore, reasonably relied on the prosecutor's "representation that it had fully disclosed all relevant information its file contained." 540 U.S. at 675, 693–94.

Here, Petitioner states his post-conviction counsel was entitled to rely on the State's continuous duty to provide *Brady* material based on the trial court's May 8, 2018 order, as a basis for excusing any failure to develop his *Brady* claim in state court. [Doc. 101 p. 9; *see* Doc. 22-25 pp. 62-63]. Stated another way, he suggests his post-conviction counsel was not at fault for failing

25

to develop his *Brady* claim in state court because he relied on the State's continuous duty to provide his attorney with *Brady* material [Doc. 101 p. 9]. But an important distinction exists between *Banks* and *Strickler* and Petitioner's case. In *Strickler*, it was "undisputed" that the state withheld evidence. 527 U.S. at 282 (stating "there is no dispute" that the state had failed to disclose exculpatory evidence). Similarly, in *Banks*, there was evidence that the state, "[t]hrough direct appeal and state collateral review proceedings, . . . continued to hold" exculpatory evidence and let it "stand uncorrected." 540 U.S. at 675.

But unlike *Strickler* and *Banks*, Petitioner offers no plausible argument that the State withheld any exculpatory evidence "either purposefully or inadvertently," *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2017) (citing *Strickler*, 527 U.S. at 231), that could show cause for post-conviction counsel's failure to raise Petitioner's *Brady* claim in his Supplemental Amended Petitions for Post-Conviction Relief, *see Banks*, 540 U.S. at 667. *See Blanchard*, 8 F. Supp. 2d at 669 ("'The mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for default.'" (quoting *Murray*, 477 U.S. at 488)).

For these reasons, Petitioner has not shown he was diligent for failing to develop the factual basis of his *Brady* claim related to Boyd, or raise it, in state court.

### 3. Good-Cause Analysis

Even if Petitioner was diligent in developing the factual basis of his *Brady* claim in state court, Petitioner, for the reasons that follow, has not shown good cause for discovery under Rule 6 as to Requests 6, 7, or 8. Before addressing whether Petitioner has shown good cause for discovery under Rule 6, the Court "must first identify the essential elements of" Petitioner's *Brady* claim. *Bracy*, 520 U.S. at 904 (quoting *United States v. Armstrong*, 517 U.S. 456, 468 (1996)). A

*Brady* claim has three elements: (1) "the evidence in question [is] favorable" to the accused; (2) "the state suppressed the relevant evidence, either purposefully or inadvertently;" and (3) "the state's actions resulted in prejudice." *Bell*, 512 F.3d at 231 (citing *Strickler*, 527 U.S. at 281–82). Under the first element of *Brady*, "[f]avorable evidence is evidence that is exculpatory or impeaching," *Hughbanks v. Hudson*, 2 F.4th 527, 536 (6th Cir. 2021) (internal quotation marks and citations omitted), and so a prosecutor's duty to disclose under *Brady* encompasses impeachment as well exculpatory evidence, *Strickler*, 527 U.S. at 280.

In support of these discovery requests, Petitioner asserts "he has demonstrated that the state switched its theory from the time of his [Petitioner's] trial in 2009 to when Boyd was tried in 2019 in state court" [Doc. 83 p. 40]. Specifically, Petitioner claims "[t]he state's abandonment of its specific theory about [Petitioner]'s use of a gun and his presence at [Mr.] Newsom's death suggests exculpatory evidence may have been suppressed at the time of" his trial [*Id.*; *see id.* at 18 (asserting that the State also endorsed its theory during opening argument of Boyd's trial that "there was a different gun" used in Mr. Newsom's death)].

Respondent maintains that Petitioner's assertion that the State unlawfully suppressed unidentified evidence favorable to him is baseless because he does not identify specific evidence that the State "purportedly" withheld and he has not shown the materiality of the suppressed evidence [Doc. 96 p. 39]. As such, Respondent claims his discovery requests are "another fishing expedition on an unsupported *Brady* claim" [*Id.* at 40].

### a. Requests 6 and 7 – KPD and Knox County District Attorney General's Office Records

As to "Requests 6 and 7," Petitioner argues "[i]t is a near certainty that KPD and the prosecutor's office have records related to Thomas's testimony that Boyd was the triggerman" [Doc. 83 p. 40]. Although the prosecution disclosed Investigator Childress's notes from his 2018

27

interview with Thomas to post-conviction counsel, the prosecution, he states, did not close the following information: how the interview came about and whether another investigation establishing Boyd as the triggerman had occurred and if so, what was uncovered [*Id*. at 41]. Based on Thomas's testimony that he spoke with Investigator Childress and Prosecutor Price, he states "it is plausible KPD records and prosecution records exist that are relevant specifically to Thomas's testimony as well as to [Petitioner]'s *Brady* claim" [*Id*. at 40–41]. In addition, he insists "it is also plausible that these records will establish that at the time of [Petitioner]'s trial, members of the prosecution team possessed evidence showing Boyd's guilt" [*Id*. at 40].

Again, to establish "good cause" for discovery, Petitioner need not "prove" his *Brady* claim. *See Bracy*, 520 U.S. at 903; *see also Keenan*, 262 F. Supp. 2d at 839 ("Although a petitioner is not required to demonstrate that discovery will unquestionably lead to a cognizable claim for relief, 'vague and conclusory assertions are not sufficient under Rule 6 and a petitioner may not embark on a fishing expedition intended to develop claims for which there is no factual basis." (citations omitted)). He need show only that the requested discovery "*could* yield evidence enabling . . . [him] to prevail on his" *Brady* claim or "*could* 'resolve any factual disputes that could entitle him to relief.'" *Bagley*, 380 F.3d at 975 (emphasis added) (quoting *Stanford*, 266 F.3d at 460). Still, he must do so by offering "specific allegations of fact," giving the Court "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate he is . . . entitled to relief[.]" *Harris*, 394 U.S. at 300.

Petitioner has not offered specific allegations of fact that records from KPD, as to how its interview with Thomas came about or whether another investigation was launched into Boyd, exist beyond the notes that Investigator Childress already provided to post-conviction counsel and beyond what the State provided in their "over 70 gigabytes of [discovery] material" [Doc. 83 p.

28

21]. *See Green v. Artuz*, 990 F. Supp. 267, 271 (S.D.N.Y. Jan. 8, 1998) ("[G]eneralized statements about the possible existence of material do not constitute 'good cause.' Rather a petitioner must produce specific evidence that supports his claim that the requested material exists." (citations omitted)); *see also Bracy*, 520 U.S. at 990 (finding good cause for discovery in support of a judicial-bias claim when the petitioner "pointed not only to" the trial judge's conviction for bribes, but "also to *additional evidence* . . . that lends support to his claim" that the judge was biased in petitioner's own case (emphasis added)). His claim that "it is plausible" these records "will establish that . . . members of the prosecution team possessed [and suppressed] evidence showing Boyd's guilt" at the time of Petitioner's trial is also unsupported by sufficient allegations of fact [Doc. 83 pp. 40–41]. And although Petitioner asserts "he has demonstrated that the state switched its theory from the time of his trial in 2009 to when Boyd was tried in 2019 in state court" [*id*. at 40], Thomas testified at the *coram nobis* hearing that he did not disclose information that Boyd killed Mr. Newsom until 2018, well after Petitioner's 2009 trial [Doc. 13-29 p. 18:15]. His statement that these records "are relevant" specifically to Thomas's testimony as well as to Davidson's *Brady* claim, [Doc. 83 pp. 40–41], is tenuous; it is not supported by specific allegations of fact that they may include impeachment evidence impugning Thomas's testimony or that the State otherwise withheld evidence during Petitioner's trial. *See Keenan*, 262 F. Supp. 2d at 838 ("[V]ague and conclusory assertions are not sufficient under Rule 6[.]"); *see also Strickler*, 527 U.S. at 286 ("Mere speculation that some exculpatory may have been withheld is unlikely to establish good cause for discovery[.]"). For these reasons, Petitioner has failed to show good cause for discovery as to Requests 6 and 7.

### b.    Request 8 – ATF and FBI Records

In "Request 8," Petitioner "seeks information in the custody of" the ATF and FBI "about showing [Petitioner] was not the triggerman for Newsom's death," "records suggesting investigation into other suspects," "or [records] undermining the State's theory that [Petitioner] was the triggerman" [Doc. 83 p. 41].[10]

### i.    ATF Records

Petitioner states, "[i]n response to" Freedom of Information Act ("FOIA") requests, ATF was actively involved in the investigation into Mr. Newsom's and Ms. Christian's murders and maintains its investigation is ongoing [*Id*. at 41–42]. Pursuant to the FOIA request, Petitioner indicates that some of the ATF's Reports of Investigation ("ROI") were disclosed, but "certain pages of the reports were not provided" [*Id*. at 42]. He states it is, therefore, "inescapable that the agency was significantly involved in the investigation," and therefore, it "is likely ATF has additional records" showing Boyd, not Petitioner, was the triggerman [*Id*. at 42]. In addition, he states "it is likely the ATF has additional records and that they suggest Boyd was the triggerman, he used a gun not linked to [Petitioner], and [Petitioner] was not present" [*Id*.]

Petitioner does not adequately explain, by offering specific allegations of fact, that the ATF's continued involvement in the investigation, by itself, may yield *Brady* material [*Id*.]. *See Stanford*, 266 F.3d at 460 ("The burden of demonstrating the materiality of the information requested is on the moving party." (citation omitted)); *Bracy*, 520 U.S. at 990 (finding the petitioner set forth "'sufficient allegations'" supporting his discovery request by pointing, "not only to" the trial judge's conviction for bribes, but "also to *additional evidence* . . . that lends

---

[10]    Petitioner makes a passing reference to "other suspects" [Doc. 83 p. 41]. Aside from naming Boyd, he does not state who these "other suspects" could be or otherwise set forth specific allegations of fact that ATF and FBI records may yield information about other suspects.

support to his claim" the judge was biased in the petitioner's own case (emphasis added)). Although he states it is likely the ATF has additional records that suggest Boyd was the triggerman and Petitioner was not present during Mr. Newsom's murder, this information was already disclosed by Thomas when he testified during the *coram nobis* hearing. *See Davidson*, 2021 WL 3672797 at *53–54. To the extent he claims the State withheld this evidence during Petitioner's trial, in furtherance of his *Brady* claim, Thomas testified he did not disclose what he knew about Mr. Newsom's murder to the State until 2018 [Doc. 13-29 p. 18:15]. Again, Petitioner does not offer specific allegations of fact that ATF records may yield information rebutting Thomas's testimony. *See Bagley*, 390 F.3d at 975 (explaining that "good cause" exists under Rule 6 when a habeas petitioner shows the requested discovery "could 'resolve any factual disputes that could entitle him to relief'" (quoting *Stanford*, 266 F.3d at 460)). Accordingly, this request for discovery falls more in the category of a fishing expedition masquerading as discovery. *See Springs v. United States*, No. 1:13-cv-341, 2014 WL 12780225, at *1 (E.D. Tenn. Jan. 7, 2014) ("Good cause . . . does not entitle a movant to go on a fishing expedition through government files in hopes of finding some damaging evidence." (citation omitted)). For these reasons, Petitioner has not shown good cause to obtain ATF records.

### ii.      FBI Records

Petitioner also claims it is likely the FBI has records suggesting Boyd was the triggerman [Doc. 83 p. 43]. As good cause for this request, Petitioner states the FBI, pursuant to his federal habeas counsel's FOIA request, produced a heavily redacted document, "referenced as 252B-IR-9026 Serial 1" [*Id*.]. Petitioner explains that this document reflects that in 2010, KPD contacted the FBI, seeking assistance interviewing Cobbins [*Id*.]. According to Petitioner, the document states, "'KPD believes Cobbins and [redacted] [two to three lines redacted] *prior* to the rape,

31

torture, and murders of Christian and Newsom'" [*Id*. (emphasis added)]. Accordingly, Petitioner states this document shows the KPD sought the FBI's assistance in pursuing a line of investigation that involved Cobbins and one of the co-defendants [*Id*.]. Given Thomas's subsequent testimony that Boyd was the triggerman, Petitioner states it is reasonable to conclude the redacted name is co-defendant Boyd [*Id*.].

Petitioner does not adequately explain how this discovery request is material to his *Brady* claim. *See Stanford*, 266 F.3d at 460 ("The burden of demonstrating the materiality of the information requested is on the moving party." (citation omitted)). That is, even if the name in the redacted document is "Boyd," Petitioner does not explain how this information—what Boyd may have done prior to the murders—tends to support his theory that the state withheld evidence regarding the triggerman in Mr. Newsom's death. In a similar vein, he does not set forth sufficient allegations of fact that the State suppressed exculpatory evidence in the first instance or that Thomas's testimony, that he did not come forward with what he knew about Mr. Newsom's murder until 2018, was unreliable [Doc. 13-29 p. 18:15]. As such, his request to obtain FBI records also falls more in the category of a fishing expedition masquerading as discovery. For these reasons, Petitioner has not shown good cause to obtain FBI records.

## III.  CONCLUSION

For the foregoing reasons, Petitioner's Motion for Discovery [**Doc. 82**] in furtherance of his *Strickland* and *Brady* claims "related to Baumgartner," (Requests 1 through 5, relating to Claims 5.9–5.9E) [Doc. 83 p. 27; *see* Doc. 24 pp. 191–96 (Claims 5.9–5.9.E)], is **DENIED WITHOUT PREJUDICE**, and his Motion for Discovery [**Doc. 82**] in furtherance of his *Brady* claim "related to Boyd" (Requests 6 through 8, relating to Claim 6) [Doc. 83 p. 39; *see* Doc. 24

pp. 197–200 (Claim 6)] is **DENIED**.

       **IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge